In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 21-3091

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PAIGE DAVIS,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:21-cr-30036 — **Stephen P. McGlynn**, *Judge.*

———————————

ARGUED MAY 27, 2022 — DECIDED AUGUST 11, 2022

———————————

Before ST. EVE, KIRSCH, and JACKSON-AKIWUMI, *Circuit Judges.*

KIRSCH, *Circuit Judge.* Police arrested Paige Davis, a convicted felon, on a state warrant for three counts of aggravated battery by discharge of a firearm, just outside of his residence and then entered his house without a warrant. Police conducted a limited sweep of the home and a later consensual search. The officers recovered a .22 caliber rifle which led to Davis being charged with illegally possessing a firearm in

violation of 18 U.S.C. § 922(g)(1). Davis moved to suppress the
rifle on the basis that no valid exception to the warrant re-
quirement justified the initial entry and then the later search.
The district court denied Davis's motion based on the undis-
puted facts in the record, finding that the sweep and search
were justified by three separate exceptions to the warrant re-
quirement—a protective sweep following Davis's arrest, exi-
gent circumstances because a child was in the home at the
time of the arrest, and the voluntary consent to search by Da-
vis's housemate, Antionette Ewing-Jimerson. Davis then pled
guilty and reserved his right to appeal the denial of his mo-
tion.

On appeal, Davis argues that the sweep and search were
not justified under any of the exceptions identified by the dis-
trict court. We disagree, at least as to consent. Davis does not
dispute the fact that Ewing-Jimerson's consent was voluntary,
and the undisputed facts show that her consent was not
tainted by the initial entry into the house, so suppression is
unwarranted.

## I

The facts are undisputed and based largely on the police
report from the day of the arrest, upon which both parties re-
lied. Paige Davis is a convicted felon with an extensive history
of violent crimes, including aggravated battery of a peace of-
ficer. In October 2020, Davis was charged with three counts of
aggravated battery by discharge of a firearm in violation of
720 Ill. Comp. Stat. 5/12-3.05(e)(1), and a state arrest warrant
was issued. Two months later, members of the U.S. Marshals
Great Lakes Regional Fugitive Task Force learned Davis's
whereabouts and arrested him just outside the front door of

his residence, as he was opening the door and stepping out to walk his dog.

While being arrested, Davis told the officers that there were children in the house. Officers then entered the house to conduct a limited sweep of areas where a person could be hiding, finding an eight-year-old child and a nineteen-year-old (whom Davis may have understood to be a child). During the sweep of the house, an officer observed a .22 caliber rifle standing upright in plain view in an open bedroom closet.

About 45 minutes later, well after the sweep had concluded, Antionette Ewing-Jimerson, a woman with whom Davis was living and the owner of the house, arrived home. Officers were still at the scene when she arrived. Ewing-Jimerson gave the officers oral and written consent to search the home, acknowledging that she had been advised of her rights pertaining to the search. The district court found that she was not detained during the discussion and gave her consent "without threats or promise of any kind." She talked with the officers during the search and volunteered information, including where Davis slept and his relationship to her. Davis, who was outside the house in custody and not present when Ewing-Jimerson gave her consent, never objected to the search.

The district court denied Davis's motion to suppress the rifle, finding that the warrantless entry and search were justified under three exceptions to the warrant requirement. First, the court found that the initial entry was justified as a protective sweep because the lack of detail on the ages of the children in the house suggested that a person inside the house could be a threat to officer safety, who were just outside the house. Second, the court found that entry was alternatively

justified under the exigent circumstances exception because, given that the ages of the children were not known, there was a "compelling need to ensure the children's safety immediately." Finally, the court found that the subsequent search was justified based on Ewing-Jimerson's consent to search the residence because her consent was voluntary and not tainted by the initial entry, even if it were illegal.

## II

We review the district court's denial of a motion to suppress under a mixed standard: legal conclusions de novo and factual findings for clear error. *United States v. Terry*, 915 F.3d 1141, 1144 (7th Cir. 2019). The facts in this case are not disputed, so our review is de novo. *United States v. Conrad*, 673 F.3d 728, 732 (7th Cir. 2012). Because we conclude that Ewing-Jimerson's valid consent justified the warrantless search, we will start and end there.

Warrantless entry is presumptively unreasonable under the Fourth Amendment, see, e.g., *United States v. McGill*, 8 F.4th 617, 621 (7th Cir. 2021), so it is the government's burden to show, by a preponderance of the evidence, that the search was reasonable under a valid exception to the warrant requirement, *Riley v. California*, 573 U.S. 373, 382 (2014); *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000). In determining whether consent justifies a warrantless search, we determine whether the consenting individual had authority to consent to the searched spaces and whether her consent was voluntary. See *United States v. Correa*, 908 F.3d 208, 221–22 (7th Cir. 2018).

Davis does not dispute that Ewing-Jimerson, a co-resident in the shared home, had authority to give consent to the

spaces searched in this case, see *Terry*, 915 F.3d at 1145, and he concedes that Ewing-Jimerson's consent was voluntary, see *United States v. Thompson*, 842 F.3d 1002, 1009–10 (7th Cir. 2016) (voluntariness is a question of fact). Rather, Davis argues that, even if voluntary, Ewing-Jimerson's consent was tainted by an initial, illegal entry. When the government justifies a search after illegal entry based on voluntary consent, the government must show that the illegal entry did not taint that consent. *United States v. Robeles-Ortega*, 348 F.3d 679, 681 (7th Cir. 2003); *Conrad*, 673 F.3d at 732–33. Here, we can assume without deciding that the initial entry was illegal, because even so, it did not taint Ewing-Jimerson's subsequent consent.

Whether consent was tainted is a question of attenuation—was the voluntary consent "obtained by exploitation of" the preceding Fourth Amendment violation, *Brown v. Illinois*, 422 U.S. 590, 603 (1975), "or instead by means *sufficiently distinguishable* to be purged of the primary taint," *Robeles-Ortega*, 348 F.3d at 681? To decide whether voluntary consent was sufficiently attenuated, we use a multi-factor balancing test, "including (1) the temporal proximity of the illegal entry and the consent, (2) the presence of intervening circumstances, and, particularly, (3) the purpose and flagrancy of the official misconduct." *Id.* (citing *Brown*, 422 U.S. at 603–04).

The undisputed facts establish that Ewing-Jimerson's voluntary consent was sufficiently attenuated from the initial entry. First, Davis concedes that 45 minutes passed between the initial entry and Ewing-Jimerson's voluntary consent. Forty-five minutes is more than sufficient time to support attenuation. See *United States v. Pineda-Buenaventura*, 622 F.3d 761, 776 (7th Cir. 2010) (forty-five minutes sufficiently attenuated);

*United States v. Parker*, 469 F.3d 1074, 1078 (7th Cir. 2006) ("a matter of minutes" sufficient). Second, it is undisputed that Ewing-Jimerson was absent from the scene during the initial entry and first arrived long after the initial sweep was over. Her arrival long after the initial entry was a clear intervening circumstance severing any causal connection between an illegal search and subsequent consent. See *Robeles-Ortega*, 348 F.3d at 682 (characterizing such a case where the consenting individual "was not even at home when the illegal entry was made, and therefore the force and nature of the intrusion would not have tainted his consent"). Although Davis argues that the ongoing police presence and control of the scene at the time Ewing-Jimerson arrived negates the effect of her arriving after the sweep had long been completed, the "mere presence" of officers outside of the house is not enough from which to find an illegal entry tainted a (as Davis concedes) voluntary search. *United States v. Valencia*, 913 F.2d 378, 382 (7th Cir. 1990).

But we do not close our attenuation inquiry without careful scrutiny of the "most important" factor—the purpose and flagrancy of the official misconduct, *Conrad*, 673 F.3d at 735, because with voluntariness conceded, our critical inquiry pivots from the consenting individual to whether law enforcement acted in bad faith. This inquiry matters because we do not employ the exclusionary rule when "suppression would do nothing to deter police misconduct." *Davis v. United States*, 564 U.S. 229, 232 (2011). We have previously cautioned courts that losing sight of this "fundamental notion" allows guilty people to go free due to an irrelevant bungle on the part of law enforcement. *United States v. Carter*, 573 F.3d 418, 422 (7th Cir. 2009) (citation omitted); see also *Davis*, 564 U.S. at 236 (stating the well-settled principle that suppression of

evidence is not a Fourth Amendment right nor a remedy for a Fourth Amendment violation). Rather, we employ the exclusionary rule to ensure the proper incentives are in place for law enforcement to deter "intentional conduct that was patently unconstitutional." *Herring v. United States*, 555 U.S. 135, 143 (2009); see also *Davis*, 564 U.S. at 231–32 (referring to the exclusionary rule as a "deterrent sanction" on the prosecution), *id.* at 236–37 ("The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations."). By examining the purpose of the official misconduct, we ensure that "wanton and purposeful … Fourth Amendment violation[s]" cannot simply be excused by subsequent voluntariness. *Brown*, 422 U.S. at 602–03.

The only misconduct Davis alleges is the officers' decision to initially enter the house without a warrant, arguing the sweep lacked sufficient legal basis and disturbed two members of the household. While we decline to decide whether the government met its burden to prove that entry was justified as a protective sweep or by exigent circumstances, the government has met its burden to show that the officers had good-faith reasons to go into the home and conduct a limited sweep for individuals who might cause harm to the officers or to themselves. When the officers went into the home, they were aware from the warrant that Davis had allegedly recently used a firearm and that other individuals of unknown ages were in the house. The sweep was undisputedly very limited. It was conducted in a nonaggressive manner and was limited to areas where a person could be hiding. The officers did not search any enclosed areas such as drawers or cabinets and allowed two individuals who were in the residence to get dressed and step outside without incident. See *Conrad*, 673 F.3d at 736 (finding consent was not tainted even though

police initially entered the curtilage of a home illegally, when the police behavior was "professional" inside the home, and they did not enter it as a "fishing expedition"). The officers were looking only for individuals who could harm the officers located just outside the home or could harm themselves if left alone in the house. Furthermore, the arrest occurred in very close proximity to and just outside the front entryway to the home. Finally, we note, even though our review is de novo, that the district judge concluded that not only did the officers not act in bad faith, but that based on what they knew at the time, a protective sweep was warranted. To reverse based on a finding of a purposeful and flagrant violation of Davis's rights would suggest that we find the district judge's conclusion wildly off the mark, and we have no facts which suggest that. There is simply nothing to support finding Ewing-Jimerson's voluntary consent was tainted by the initial entry, even if that entry was illegal.

The dissent reasons that the attenuation exception does not apply because the rifle was first observed during the initial sweep, not the consensual search. But the attenuation exception applies regardless of whether the rifle was first observed in the initial sweep. See *United States v. Liss*, 103 F.3d 617 (7th Cir. 1997). In *Liss*, officers entered a barn to recover a stolen motorcycle, observed a dried marijuana plant, and then proceeded to search the barn without a warrant. *Id.* at 618–19. After leaving the barn, the officers obtained consent and a warrant and went back to conduct a subsequent, lawful search of the barn. *Id.* at 619. Liss moved to suppress all of the evidence seized. *Id.* The district court denied the motion. *Id.* On appeal, we first assumed that all the evidence found in the barn was obtained pursuant to an initial, unlawful search. *Id.* at 620. But then we applied the attenuation exception to affirm

the district court based on the later, lawful search: "The exclusionary rule does not require the exclusion of evidence when the causal connection between the illegal police conduct and the procurement of the evidence is so attenuated as to dissipate the taint of the illegal action." *Id.* (citation omitted and cleaned up). There is no basis for the dissent's rule that an officer's observation during an initial, illegal search of what later may be seized as evidence during a subsequent, lawful search requires us to pivot from the attenuation exception to the inevitable discovery exception. In the dissent's lead case for this rule, *United States v. Cooper*, 24 F.4th 1086 (6th Cir. 2022), the evidence at issue was seized—not just observed—during the initial, illegal search. See *id.* at 1095–96 (holding that because "[t]he gun was seized during the initial unlawful search, … inevitable discovery, not attenuation, is the right tool for the job."). So *Cooper* provides no support for the conclusion that observation alone renders the attenuation doctrine irrelevant.

One last argument merits brief mention. Davis complains that the officers did not seek his consent to search the residence but rather waited for Ewing-Jimerson to arrive home and then obtained her consent to search the shared residence. It's well-settled that police may obtain valid consent from someone with common authority over the shared premises when the defendant is not present (even if he is nearby), which is undisputed here. *United States v. Matlock*, 415 U.S. 164, 166, 177 (1974); see also *United States v. Witzlib*, 796 F.3d 799, 802 (7th Cir. 2015).

AFFIRMED

JACKSON-AKIWUMI, *Circuit Judge*, dissenting. The exclusionary rule is "the principal judicial remedy to deter Fourth Amendment violations." *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)). The rule requires courts to exclude evidence obtained as a direct result of an illegal action. *Id*. It also requires courts to suppress so-called "fruit of the poisonous tree"—that is, evidence discovered later but derived from the illegal action. *Id.* The attenuation test from *Brown v. Illinois*, 422 U.S. 590 (1975), applies only to the latter type of evidence—again, evidence discovered later but derived from an earlier, illegal action. This appeal does not involve the type of secondary fruit to which *Brown*'s attenuation test applies. I therefore cannot join my colleagues in using the test to resolve Paige Davis's appeal.

The police officers in this case conducted two searches. First, they entered and searched Davis's home during a "protective sweep" (this is the search the majority opinion assumes without deciding was illegal). Second, officers searched Davis's home again once they obtained consent from the homeowner. If Davis sought to suppress evidence that officers discovered during the *second* search, then I would apply the *Brown* attenuation test to determine whether the evidence was admissible because the homeowner's consent had dissipated any taint from the earlier entry. But the parties agree that officers discovered Davis's rifle during the *first* search. Accordingly, I would hold that the district court erred when it assessed the homeowner's consent in terms of attenuation. The homeowner's consent was relevant, if at all, only under the inevitable discovery doctrine. The record is too undeveloped, however, for us to affirm the district court's ruling based on the inevitable discovery doctrine. And because I am

unpersuaded by the district court's other justifications for admitting the rifle, I would vacate Davis's conviction.

A quick recap of the facts—almost all of which come from a single incident report since there was no suppression hearing: Officers went to Davis's home to execute an arrest warrant. Davis bumped into them when he stepped outside to walk his dog. He immediately surrendered without incident. Despite having already arrested Davis—the sole reason officers were at the scene—officers conducted a "protective sweep" inside the house and discovered a rifle. About 45 minutes later, homeowner Antionette Ewing-Jimerson arrived and spoke with the same officers, who asked for her consent to enter the house again. According to the district court's characterization of events, officers then seized the rifle that they had discovered during their prior search.

Because officers had already discovered the rifle during their initial search, the district court erred when it applied *Brown*'s attenuation test to Ewing-Jimerson's consent. To explain why, I start with a review of the exclusionary rule and some of its exceptions.

The exclusionary rule prohibits the introduction of two broad types of evidence. First, it bars "primary evidence obtained as a direct result of an illegal search or seizure." *Strieff*, 579 U.S. at 237 (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). Second, it bars derivative evidence that is "acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Murray v. United States*, 487 U.S. 533, 536–37 (1988) (citations omitted). As the majority opinion emphasizes, however, the exclusionary rule is not meant to punish past sins; the rule's only

purpose is to deter future misconduct. *Davis v. United States*, 564 U.S. 229, 232 (2011). When excluding evidence would not further the goal of deterrence, the Supreme Court created exceptions to the exclusionary rule so that it does not apply. Three of the exceptions "involve the causal relationship between the unconstitutional act and the discovery of evidence." *Strieff*, 579 U.S. at 238 (citations omitted). Those three exceptions are: (1) the inevitable discovery doctrine, which applies when evidence would have been discovered even without the unconstitutional act; (2) the independent source doctrine, which allows the admission of evidence obtained in an unlawful search if officers also acquired it from another, lawful source; and (3) the attenuation doctrine, which applies when the connection between the discovery of evidence and the illegal act is remote or has been interrupted by intervening circumstances. *Id.*

One difference between these three exceptions is the type of evidence at issue. Whereas the inevitable discovery or independent source exceptions can save from exclusion any evidence connected to an illegal search—direct or derivative—the attenuation doctrine concerns *only* evidence indirectly derived from the illegal search—or, as our sister circuit calls it, "secondary fruits." *United States v. Cooper*, 24 F.4th 1086, 1093, 1095–96 (6th Cir. 2022); *see also Brown*, 422 U.S. at 601–02 (evaluating derivative evidence); *United States v. Conrad*, 673 F.3d 728, 732 (7th Cir. 2012) (same); *United States v. Robeles-Ortega*, 348 F.3d 679, 681 (7th Cir. 2003) (same). This is because the whole point of the attenuation doctrine is to assess whether secondary fruit has fallen so far away from the poisonous tree that a policy of deterrence no longer applies. *See Conrad*, 673 F.3d at 732. *See also* Orin S. Kerr, Good Faith, New Law, and the Scope of the Exclusionary Rule, 99 Geo. L.J. 1077, 1099

(2011) (comparing doctrine to proximate cause); *Cooper*, 24 F.4th at 1092 (same). Indeed, the *Brown* attenuation test presupposes that the challenged evidence was *not* discovered during an illegal search. Courts applying the test focus on the gap between an illegal action and the discovery of evidence by considering, among other things, how much time has elapsed and any intervening circumstances. *Robeles-Ortega*, 348 F.3d at 681 (citing *Brown*, 422 U.S. at 603–04). And they do so to answer the ultimate question of whether the discovery of the challenged evidence was "sufficiently distinguishable" from the illegal action. *Brown*, 422 U.S. at 599.

This case does not involve secondary fruits: Police had already discovered Davis's rifle when they sought Ewing-Jimerson's consent for a second search. Accordingly, the district court erred when it applied the attenuation doctrine. *See Cooper*, 24 F.4th at 1095–96 (holding that district court erred by applying attenuation test when homeowner consented to a second search but the challenged evidence was discovered during earlier, illegal search).[1] Even if the district court were correct that Ewing-Jimerson's consent was free of any taint, that finding would show only that the causal link was too remote to justify suppression of any evidence found during the second, consensual search. *See id*. at 1095 (citing *Strieff*, 579 U.S. at 238). But according to the incident report, the only evidence discovered during the second search were

---

[1] The majority opinion emphasizes that in *Cooper*, the police both discovered and seized the contraband during the initial illegal search. But the Sixth Circuit emphasized that the attenuation doctrine would be relevant, if at all, only to "any evidence found during the consent search." *Cooper*, 24 F.4th at 1095.

items confirming Davis lived at the home—his clothes, wallet, and bank card—none of which Davis sought to suppress.

The only way that Ewing-Jimerson's consent could possibly be relevant to the discovery of the rifle during the initial sweep is as an application of the inevitable discovery doctrine. *See Cooper* 24 F.4th at 1093-94 (explaining that district court should have used inevitable discovery doctrine to assess retroactive consent to search). Discovery of the rifle was inevitable, the argument would go, because police would have sought Ewing-Jimerson's consent to search the house regardless of whether they did the earlier sweep. But the government—which has the burden of establishing that officers' warrantless entry was reasonable, *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000)—did not raise an inevitable discovery argument here or in the district court. And based on the undeveloped record before us (recall there was no suppression hearing), it is not clear whether the officers would have sought Ewing-Jimerson's consent for a second search had they not already been aware of the rifle.[2] *See United States v. Rosario,* 5 F.4th 706, 713 (7th Cir. 2021) (quoting *United States v. Marrocco*, 578 F.3d 627, 637–38 (7th Cir. 2009)) (for inevitable

---

[2] Indeed, the facts surrounding Ewing-Jimerson's consent are particularly muddled. In the district court, the government conceded that officers told Ewing-Jimerson about the rifle as one reason why they wanted her consent to search the house again. But this fact was not mentioned by the district court and does not appear in the police report from the day of the arrest, which is the only piece of evidence in the record. And neither party mentions this discrepancy on appeal. I find this fact concerning because it is well established that police cannot exploit illegally obtained knowledge to coerce consent. *United States v. Liss*, 103 F.3d 617, 621 (7th Cir. 1997). Nonetheless, Davis does not raise the issue on appeal, and it does not change my overall conclusion.

discovery to apply, "Government must demonstrate that it would have conducted a lawful search absent the challenged conduct"). We thus cannot say whether an inevitable discovery argument would have been successful.

In my view, the majority opinion errs just as the district court did in applying the attenuation doctrine. To be clear, I do not quibble with my colleagues' decision to address attenuation; the parties have framed this case in terms of the attenuation doctrine. But under these facts, any attenuation argument must fail. This is because, contrary to what the majority opinion expresses, our goal under the *Brown* test is not to determine whether police obtained Ewing-Jimerson's *consent* through sufficiently attenuated means. Ante at 5. Rather, we must consider whether the *rifle*—that is, "the evidence to which instant objection is made"—is a product of the initial illegal entry or of some other, sufficiently distinguishable means. *Id.*; *See also Robeles-Ortega*, 348 F.3d at 681 (collecting cases). On this record, even if Ewing-Jimerson's consent was sufficiently attenuated, I see no basis to characterize the rifle as a product of her consent. Police undisputedly found the rifle during the first search.

I also see no significance in the district court's implied finding that police waited to *seize* the rifle during the second search.[3] Our concern is with how authorities discovered the

---

[3] The district court here characterized the rifle as having been seized during the second, consensual search, but the underlying police report is ambiguous as to when the rifle was seized. An alternative reading of the report is that police seized the rifle during the initial sweep and did not seek Ewing-Jimerson's consent until after the rifle was already in police custody. Nonetheless, Davis does not challenge the district court's

rifle, not how they seized it. "The attenuation doctrine evaluates the causal link between the government's unlawful act and the *discovery* of evidence." *Strieff*, 579 U.S. at 238 (emphasis added). And in every attenuation case cited by the majority opinion, the government sought to introduce derivative evidence that authorities had discovered during a subsequent investigation marked by intervening circumstances.[4] The majority opinion cites no authority by which officers can rely on the attenuation doctrine to seize evidence that they had already discovered during an earlier illegal action.[5] Nor have I

characterization of events, and so we operate under the assumption that officers waited to grab the rifle during the second search. Thus, I do not read the majority opinion as holding that the rifle would have been admissible even if Ewing-Jimerson's consent came after both the discovery *and* seizure of the rifle.

[4] *See Conrad*, 673 F.3d at 731 (evidence from consensual search of apartment two hours after illegal search of different apartment); *United States v. Pineda-Buenaventura*, 622 F.3d 761, 775 (7th Cir. 2010) (officers searched wrong apartment but stopped before evidence was found, then resumed search and found evidence after obtaining consent); *United States v. Carter*, 573 F.3d 418, 421–22 (7th Cir. 2009) (fruits of follow-up investigation after police learned defendant's identity during an illegal search); *United States v. Parker*, 469 F.3d 1074, 1076 (7th Cir. 2006) (evidence found during consensual search following illegal arrest); *Robeles-Ortega*, 348 F.3d at 680–81 (evidence found during consensual search following illegal entry); *United States v. Valencia*, 913 F.2d 378, 382 (7th Cir. 1990) (evidence found during consensual search following illegal entry); *Brown*, 422 U.S. 596–97 (mirandized statements following illegal arrest).

[5] The majority opinion cites *Liss* as authority that the attenuation exception applies regardless of whether evidence was discovered during the illegal action. But in *Liss*, our court did not apply the attenuation doctrine to admit the marijuana or any other evidence discovered during the initial search of Liss's barn; the only evidence at issue was different

found any. To the contrary, we have instructed courts to *suppress* evidence under facts similar to this case. *See Liss*, 103 F.3d at 621 (citing *United States v. Gillespie*, 650 F.2d 127, 129 (7th Cir. 1981)) (noting that evidence initially discovered during illegal search of defendant's home must be suppressed when seized during later search to which defendant consented).

The majority opinion's reliance on consent as justification for admitting the rifle evidence means that the majority opinion did not need to address the district court's analysis of the protective-sweep and exigent-circumstances justifications for the officers' initial warrantless search. But if we reached those grounds, I would conclude that the district court erred there too. The district court reasoned that Davis's statement that

---

contraband—methamphetamine and firearms—found in Liss's house during a subsequent consensual search. *Liss*, 103 F.3d at 618–19. Our court considered the marijuana observed in Liss's barn only as part of its analysis of whether "the evidence obtained during the written-consent search must be suppressed." *Id.* at 620; *see also id.* at 622 (concluding that "the written-consent search was not tainted by the prior illegal search of the barn"). Because the illegal search did not taint the consensual search, our court determined that a subsequent search warrant based on both the illegal evidence and the consensual evidence was also valid. *Id.* at 622. But our court's approval of that warrant does not equate, as the majority opinion suggests, to a holding that evidence discovered during the initial illegal search was admissible. Liss was not even charged for the marijuana discovered during the first search; the grand jury indicted him only for possession of methamphetamine and illegal firearms. *Id.* at 619. So our court did not need to decide whether the marijuana was admissible, only whether it tainted the subsequent consensual search of Liss's house that was the source of the methamphetamine and firearms underlying the indictment. Indeed, the district court ruled that any illegally discovered evidence should be *suppressed*—regardless of latter consent—and the government did not challenge that ruling on appeal. *Id.* at 619.

there were children in the house justified a protective sweep because officers "were not given any reason to believe that those inside the home did not pose a threat." But that reasoning gets the standard backwards; the court impermissibly shifted to Davis the government's burden to cite "specific and articulable facts" suggesting that someone in the house posed a danger. *Maryland v. Buie*, 494 U.S. 325, 337 (1990). The court made a similar error when it reasoned that Davis created an exigency when he told officers that "children" were inside the house but "did not give the ages of the children inside the home nor state whether they could be exposed to any safety hazards." Again, the burden was on the government to point to some affirmative sign that would cause a reasonable officer to believe that an emergency justified an immediate warrantless entry. *Lange v. California*, 141 S. Ct. 2011, 2017 (2021); *United States v. Delgado*, 701 F.3d 1161, 1165 (7th Cir. 2012). All the officers knew was that Davis, when they asked, confirmed the presence of children. Any assumption about the ages of the children or whether they were unattended would have been based on speculation.

In sum, none of the three justifications provided by the district court supported the admission of the rifle or any other evidence that officers discovered during the initial warrantless entry into Davis's home. So unless some other exception to the exclusionary rule applies, the rifle should have been suppressed. In my view, the most applicable exception would have been the inevitable discovery doctrine, not the attenuation doctrine, but the record is too undeveloped for us to apply the inevitable discovery doctrine on appeal. For these reasons, I respectfully dissent.